EMILY FRANCIS ET AL. v. PREACHERS' AID SOCIETY, Appellant.

**Conveyances:** CANCELLATION: MENTAL INCAPACITY: BURDEN OF PROOF: 1 EVIDENCE. The burden is upon those seeking to set aside an instrument, because of the want of mental capacity in the grantors, to show that they were incapacitated when they executed the same. In this action to set aside an instrument in the nature of a deed conveying to a society of the Methodist Episcopal Church a certain interest in property, the evidence is reviewed and held insufficient to show mental incapacity on the part of the grantors.

**Same:** UNDUE INFLUENCE. The evidence is also reviewed and held 2 insufficient to establish undue influence.

**Same:** CONSIDERATION. An instrument conveying the owner's prop-3 erty subject to his wife's life support for a charitable purpose, which has been accepted by the grantee by a collateral instrument, in which the grantee agreed to secure other funds to be

used for the same charitable purpose, is supported by sufficient consideration.

**Charitable societies:** POWER TO HOLD PROPERTY: WHO MAY QUESTION SUCH POWER. The widow and collateral heirs of one who conveyed his property to a church society for a charitable purpose can not question the society's power to take and hold the property for the purpose of the grant.

**Charities:** EQUITABLE CONVEYANCES. In this action the instrument of conveyance, even if insufficient as a deed, should be treated either as an executory contract or as creating a trust, so that equity will compel a transfer of the property in accordance with the intention expressed in the instrument.

*Appeal from Polk District Court.*—Hon. W. H. McHenry, Judge.

Thursday, June 16, 1910.

The opinion states the case.—*Reversed* and *remanded.*

*S. F. Prouty* and *Samson & Noble;* for appellant.

*McLaughlin & Shankland* and *A. A. McLaughlin,* for appellees.

Sherwin, J.—The plaintiff Emily Francis is the widow of Daniel Francis, who died in May, 1908, and all of the other plaintiffs are collateral heirs of said Daniel Francis. In June, 1905, Daniel Francis and Emily Francis, his wife, executed and delivered to the Preachers' Aid Society of the Des Moines Conference of the Methodist Episcopal Church a written instrument, of which the following is a copy:

This contract, by and between Daniel Francis and Emily Francis, his wife, of Polk County, Iowa, and the Preachers' Aid Society of the Des Moines Conference of the Methodist Episcopal Church, witnesseth: That the said Daniel Francis and Emily Francis, his wife, are de-

sirous of rendering some aid out of their estate to the Preachers' Aid Society, and retain the proceeds of the property for their maintenance and support. That the Preachers' Aid Society is desirous of receiving contributions and additions to its permanent fund to carry out the purpose and objects of its organization, and that in addition to its mutual obligations between the parties hereto and the obligations that will be assumed and contracted both in favor of and by the Preachers' Aid Society, there is for this contract the additional consideration as herein named. The said Daniel Francis and Emily Francis are now the owners of considerable property, the title to which is vested in Daniel Francis, and from the income from his said property they are to derive their support, and that in the said additional consideration, that of the said property there is to be fully provided the income thereof for the support and maintenance of both the said Daniel Francis and Emily Francis, and that upon the death of the said Daniel Francis the said Preachers' Aid Society is to be charged with the duty, and hold all of the property as trustee, and obligates itself to so manage and control the said property and that the income arising therefrom shall be applied in the support of his wife, the said Emily Francis, so long as she shall live. And the said Preachers' Aid Society, in consideration of the convenants and conditions named in this contract and the disposition of the property thereunder, hereby assumes, agrees, and obligates itself to carry out the purposes of this contract. That the said Daniel Francis is to have and retain a life estate in the said property, and at his death the said Preachers' Aid Society to take charge of, hold, and use the said property and apply the income in support of the wife so long as she lives as herein provided, and no charges whatever are to be paid except actual expenses and costs. And it being upon the further expressed consideration and condition that the principal of said sum, whether of money received or real estate converted into money, shall be by the trustees of the said Preachers' Aid Society used in the establishment of a Home for needy, superannuated preachers, their wives and the widows of preachers, to be known as the 'Francis Home' and the proceeds and income arising therefrom shall be collected, used and applied in accordance

with the rules and regulations of the said Preachers' Aid Society, in the establishment of said home as now existing or hereafter enacted and adopted. But no purchaser from said Preachers' Aid Society shall be under any duty or necessity to concern himself with respect to the application of the proceeds of the sale of any property which is the subject of this instrument: Now, therefore, in consideration of the premises and of the sum of one dollar, and of other valuable consideration, the receipt of which is hereby acknowledged, this contract and deed shall be held and construed as covering and including all the real estate and property held and owned by the said Daniel Francis and shall be held and construed as now conveying all of the said property; subject only to the life estate herein reserved. That it is not practicable now to include the legal description of the real property and therefore upon the death of the said Daniel Francis this contract and instrument shall be held and construed to be the completed conveyance, by full and legal title of all of the real estate wherever situated and of all the personal property which the said Daniel Francis now owns, and shall also convey all property, real and personal, of which the said Daniel Francis may die seized, to the Preachers' Aid Society, charged only with the trust imposed, and the lien thereon and the income arising therefrom, and the maintenance and support of the said Emily Francis during her lifetime as hereinbefore provided. And the said Emily Francis, his wife, hereby consents to all of the conditions and provisions hereof, accepts the provisions herein and joins in the covenants thereof and relinquishes for the purposes herein stated her right of dower in and to said premises.

This action was brought by the widow, heirs, and administrator of Daniel Francis to set aside and cancel said instruments for the reasons following: First, because both Daniel Francis and his wife were mentally incompetent to make such an instrument. Second. Because it was procured from them by the undue-influence and fraud of certain representatives and officers of the defendant. Third. Because said instrument was never delivered

to the defendant and was without consideration. Fourth. Because the instrument is insufficient to constitute a conveyance; that it is not a deed, describes no property, and is without binding effect. Fifth. The defendants are not authorized to receive property for the purposes therein specified. The trial court found that Daniel Francis was mentally incompetent to make the instrument, and that Emily Francis did not understand the nature thereof when she signed it. The trial court also found that the instrument was procured by undue influence. A judgment was therefore entered setting aside and canceling the same.

When the instrument was executed, Daniel Francis was past seventy-eight years of age, and his wife was about the same age. Four children had been born to them, but they had all died in infancy or in early childhood; the oldest one of them reaching only the age of twelve years. They came to Des Moines in 1883, and he invested his means in vacant lots and small dwelling houses. From time to time he built new houses on his lots and an office building, and the rents from all of his properties at the time the instrument was executed and at the time of his death amounted to about $2,800 per year. In June, 1905, he considered his holdings worth at a low estimate $25,000. Mr. Francis and his wife were members of the Methodist Church, and after locating in Des Moines they united with the Asbury Park Church of that denomination, and were members thereof when Mr. Francis died. For many years prior thereto and at the time of his death he was the chairman of its board of trustees.

The two controlling questions in this case are whether Mr. Francis was mentally competent to make the instrument in question, and, if he was competent, whether it was procured by undue influence. As to his mental capacity, up to the very time of his death he managed his own business, and it is practically unquestioned that he did

1. CONVEYANCES: cancellation: mental incapacity: burden of proof: evidence.

so with intelligence and skill. He collected rents from some twenty tenants, and kept an accurate book account with each one. The money thus collected was generally deposited in the bank with which he did business, and withdrawn by check in the usual way. He looked after his own properties, superintending the making of such improvements and repairs as he deemed necessary, and no one questions his ability to fully care for his own interests in thus dealing with his property. For years he had been the chairman of the board of trustees of the Asbury Church, and during all of this time he had been active in the management of its financial affairs, and no one up to the time he executed the instrument under consideration doubted his business ability or mental capacity. He was strong physically, and, except for some lapses in memory common to advanced age, he was strong mentally. In other words, the record is full of evidence showing that Mr. Francis up until a very short time before his death was exceptionally strong physically and mentally for a person of his age. The appellees rely greatly upon a few peculiarities of Mr. Francis and upon his stinginess to his wife to prove his incapacity to make the instrument. It is shown that he generally walked instead of taking a street car; that he carried small purchases home or to some of his buildings instead of having them delivered; that he occasionally distributed candy to school children, and frequently paid for the meals of young girls at the church suppers. Mr. Francis had no business other than looking after his own property, and his time was therefore his own. He was strong, healthy, and able to walk, and liked it. It may be true that he also had in mind the economy in walking, but economy is not necessarily evidence of insanity. A healthy man can walk a few blocks in a very short time while it takes a dollar a whole year to earn one street car fare. When building he occasionally carried small pieces from the lumber yard, instead of

waiting for their delivery. This is evidence of the economy of time, but not evidence of mental derangement. His church society had an eating booth on the State Fair grounds, and he carried two baskets of tomatoes out there. The street car service may have been such that he saved time and annoyance by walking. There is no question but what Mr. Francis frequently paid for the suppers of young girls at the church. But the evidence shows that the objects of his bounty on those occasions were poor and worthy girls of from eight to twelve years of age, and the suppers usually cost fifteen cents each. There is nothing in the record characterizing this action as peculiar or as an evidence of mental derangement. Four children had been given to him and his wife and had been taken from them. It is not unusual to find parents who have been thus bereaved seeking to give pleasure to the children of the more fortunate, and to hold that such action is even a circumstance tending to show insanity would shock the sensibilities of all parents. It is shown beyond question that Mr. Francis was close in money matters, and that he refused to provide his wife with sufficient money for the purpose of winter underwear. It is also shown that she was given but little money for any purpose. However, she was physically unable to be out of the house in cold weather, and for that reason he thought she did not need the winter underclothing. Mrs. Francis seems to have acquiesced in his views of the matter, and evidently did not consider the circumstance or his general penuriousness evidence of mental incapacity. We can not further detail the evidence. It is sufficient to say that as a whole it proved the mental capacity of both Mr. and Mrs. Francis to make the instrument. While the burden rests upon the appellees to show that Mr. and Mrs. Francis were incapacitated when the instrument was made, they have wholly failed to do so, and, on the other hand, the appellants have proven capacity almost beyond a doubt.

There is practically no evidence of undue influence.
For a good many years before the execution of the instru-
ment in question, Mr. Francis had contemplated leaving

2. SAME: undue   his property for the benefit of superannuated
influence.       ministers of the Methodist Church. He had
talked of this purpose freely, not only with Mrs Francis,
who heartily approved of it, but with others. On differ-
ent occasions, when solicited for subscriptions to other
worthy objects, he had expressed his determination to devote
his property in some way to the relief of the ministers
of his own denomination. Mr. Thuresson, who was his
pastor at the time the instrument was made, urged him
to make some provision for the building of a new church,
but, after mature consideration, Mr. Francis declined to
do so. In 1900 Mr. Fletcher Brown, who was the financial
secretary of the defendant society, solicited Mr. Francis
for a subscription to the society, and he refused to con-
tribute. About a year later Mr. Brown called upon Mr.
Francis at his request, and Mr. Francis then made further
inquiry about the society, and finally gave his note for
$100 payable in five years, with interest. From that time
on he seemed to be deeply interested in the establishment
of a home for preachers and their wives. He took the
matter up with the proper church authorities, and finally
proposed to give his property for the purpose if the church
would raise an additional amount for the purpose.

An examination of the entire record not only fails
to disclose the use of any undue influence in the procure-
ment of the instrument in question, but it shows that Mr.

3. SAME: con-    Francis was himself the active force in bring-
sideration.      ing about the conditions which resulted in
his final action, and that every person connected with the
transaction acted in perfect good faith. There was a
delivery of the instrument during the lifetime of Mr. Fran-
cis. The purpose of the instrument is meritorious and the
consideration sufficient because of its acceptance and the

action of the defendant in reliance thereon. By the terms of a collateral agreement the defendant was to raise $25,000 in addition to the sum given by Mr. Francis, and this has been done. *Lewis v. Curnutt,* 130 Iowa, 423.

The plaintiffs can not raise the question of the de-

4. CHARITABLE SOCIETIES: power to hold property: who may question such power.

fendant's power to take and hold this property for the purposes expressed. *Chicago, B. & Q. Ry. Co. v. Lewis,* 53 Iowa, 101; *Rine v. Wagner,* 135 Iowa, 631.

It is said that the instrument is not a deed, and is not sufficient to transfer any right or title to the defendant. It may be conceded for the purposes of this case that it

5. CHARITIES: equitable conveyances.

is wanting in the formalities necessary to constitute a valid deed. But that does not necessarily dispose of the case. It

may be treated as an executory contract to convey, or as an instrument creating a trust, and be held effective for the purpose of carrying out the purpose and intent of Mr. Francis and the defendant. It was clearly the intention of Mr. Francis to convey to the defendant. He held the title, and, although the instrument be technically defective as a deed, it is still valid, and equity will compel a proper transfer. Warvelle on Vendors (2d Ed.) 434; *Lewis v. Curnutt, supra.* The defendant is entitled to this property, subject to the debts of Mr. Francis at the time of his death, his funeral expenses, and the life estate of Emily Francis. The judgment of the district court is therefore reversed and the case is remanded for a decree in harmony with this opinion.—*Reversed* and *remanded.*